IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

       Plaintiff,

vs.                                                                        No. CR 20-0136 JB

ANTHONY SALAZAR,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Anthony Salazar's Objections to Presentence Report, filed April 8, 2020 (Doc. 30)("Objections").  The primary issue is whether Plaintiff United States of America has proven, by a preponderance of the evidence, that Salazar is responsible for 43.45 grams of cocaine base, rather than the 1.448 grams of cocaine base to which Salazar admits in the Plea Agreement, filed January 14, 2020 (Doc. 14), such that his base offense level is 24 rather than 12, under the United States Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines") § 1B1.3(a)(2).  The Court concludes that a preponderance of the evidence demonstrates that Salazar is responsible for 1.448 grams of cocaine base rather than 43.45 grams of cocaine base.  Accordingly, the Court sustains the Objections.

## FACTUAL BACKGROUND

The Court takes its facts from the Plea Agreement and the Presentence Investigation Report ("PSR"), filed March 11, 2020 (Doc. 27).  Salazar admits that, on September 19, 2019, in San Miguel County, New Mexico, he knowingly possessed with intent to distribute less than 2 grams of cocaine base that he packaged in thirty-one separate bindles.  See Plea Agreement ¶ 9, at 4.  The PSR provides that, on September 19, 2019, Federal Bureau of Investigation ("FBI") agents and

New Mexico State Police ("NM State Police") officers executed a warrant at Salazar's home.  See

PSR ¶ 14, at 4.  FBI Agents and NM State Police officers found a wallet belonging to Salazar that

contained $2,471.00.  See PSR ¶ 15, at 4.  Near the wallet was a gray film container that held

several aluminum bindles containing cocaine base that totaled 1.448 grams.[1]  See PSR ¶ 15, at 4.

The search also revealed a digital scale and various drug paraphernalia.  See PSR ¶ 15, at 4.  Salazar

admitted to law enforcement that he sells cocaine base and that he typically receives $10.00 per

bindle.  See PSR ¶ 16, at 5.  Salazar also stated that he buys 3.5 grams of cocaine base for $200.00

each month which he then packages into bindles for resale.  See PSR ¶ 16, at 5.  Salazar admitted

to making such a purchase two or three days before law enforcement executed the search warrant.

See PSR ¶ 16, at 5.  Law enforcement have not seized the $2,471.00.  See Addendum to Objection

to Presentence Report at 2, filed June 10, 2020 (Doc. 35)("Objections Addendum").

At the time of his arrest, Salazar lived with two of his brothers, each of whom is

unemployed.  See PSR ¶¶ 14, 43, at 4, 8.  Salazar began work as a dishwasher at a restaurant in

Las Vegas, New Mexico, a week before law enforcement executed the search warrant.  See PSR

¶ 54, at 10.  For the preceding months of 2019, Salazar worked informal jobs such as cutting wood.

See Objections at 2.  Salazar has previously worked as caretaker for his disabled mother, making

---

[1]The USPO's accounting here is unclear.  The USPO contends that law enforcement
"[l]ocated" 2.4 grams of cocaine base in Salazar's home.  PSR ¶ 17, at 5.  The USPO also avers
that the cocaine-base bindles were "later determined to weigh 2.4 grams."  PSR ¶ 15, at 4.  Later
in the PSR, however, the USPO says that "[l]aboratory reports have been received and reveal that
the substance located in the residence was cocaine base and totaled 1.448 grams."  PSR ¶ 17, at 5.
Although the USPO's narrative thus conflicts with itself, the USPO nonetheless relies on the
laboratory test results in calculating the total amount of cocaine base.  See PSR ¶ 17, at 5.  Because
the United States, Salazar, and the USPO agree that he possessed 1.448 grams of cocaine base, see
Plea Agreement ¶ 9, at 4; United States' Omnibus Response to Defendant's Objections to
Presentence Report and Motion for Downward Departure/Variance at 2, filed June 15, 2020
(Doc 37)("Response"), the Court concludes that Salazar possessed with intent to distribute 1.448
grams of cocaine base.

$1,440.00 per month, but he ended this role in 2017.  See PSR ¶ 57, at 10.  Salazar reports a

monthly income of $1,188.00 between wages and food stamps.  See PSR ¶ 59, at 11.  Salazar

reports $325.00 in monthly expenses.  See PSR ¶ 59, at 11.  Salazar asserts that he lawfully earned

the $2,471.00 and maintains that he did not earn that money from selling drugs.  See Objections

at 1-2.

## ANALYSIS

The Court sustains the objection.  Although it is possible that Salazar earned the $2,471.00

from selling 43.45 grams of cocaine base, the United States has not proven, by a preponderance of

the evidence, that Salazar is responsible for 43.45 grams of cocaine base.  The USPO does not

base its calculation on reliable evidence, and the calculation itself is suspect.  Accordingly, Salazar

is responsible for 1.448 grams of cocaine base and his base offense level is 12.  See U.S.S.G.

§ 2D1.1(c)(14).

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of

conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning

is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, n.1(H).  In United States v.

Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America notes:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity --
> depends for its success upon judicial efforts to determine, and to base punishment
> upon, the real conduct that underlies the crime of conviction.  That determination
> is particularly important in the federal system where crimes defined as, for example,
> "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article
> or commodity in commerce, by . . . extortion," . . . can encompass a vast range of
> very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)).  The Supreme Court's

reasoning in United States v. Booker suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined" based on the following:

(1)

(A)      all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B)      in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)      solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)      all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)       any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  Courts may consider, as relevant conduct, actions that have not resulted in a conviction.  Pursuant to § 6A1.3's commentary, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct.  Courts may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning, J.), aff'd, 523 F.3d 1258 (10th Cir. 2008).  Accord United States v. Zapata, 546 F.3d 1179, 1192 (10th Cir. 2008)("The district court's district court's determination of drug quantity is a factual finding that must be supported by a preponderance of the evidence and is reviewed for clear error.").  The evidence and

- 4 -

information upon which the court relies, however, must have sufficient indicia of reliability.  See

U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing

determination, the court may consider relevant information without regard to its admissibility

under the rules of evidence applicable at trial, provided that the information has sufficient indicia

of reliability to support its probable accuracy.").

    When determining sentences for drug-trafficking offenses, courts calculate the base offense

level range using the Drug Quantity Table at U.S.S.G. § 2D1.1(c).  Flaws in the base offense-level

calculation are reversible procedural error.  See United States v. Jim, 786 F.3d 802, 816 (10th Cir.

2015)("Having determined that the district court erred in refusing to consider whether

§ 2A3.2(b)(4)(B)'s two-offense-level enhancement for serious bodily injury could apply in this

case, we remand for resentencing.").  In United States v. Gigley, 213 F.3d 509, 519 (10th Cir.

2000), for example, the United States District Court for the District of Kansas used the mixture

weight of methamphetamine rather than the weight of the pure substance, resulting in a base

offense level of 32 instead of the correct level of 36.  See 213 F.3d at 519.  The Tenth Circuit

remanded the case for new calculations, explaining that "[t]he district court should have used the

quantity of methamphetamine (actual) to find the base offense level because it produces a higher

sentence."  213 F.3d at 519.  In determining the base offense level, courts may consider "[t]ypes

and quantities of drugs not specified in the count of conviction[.]"  U.S.S.G. § 2D1.1 Application

Note 5.  The court may "rely on a government estimate" of a drug quantity to determine the base

offense level.  United States v. Ortiz, 993 F.2d 204, 297 (10th Cir.1993).  The estimate and the

information underlying the estimate, however, must possess "sufficient indicia of reliability to

support its probable accuracy."  U.S.S.G. § 6A1.3.

Here, the USPO maintains that, although Salazar admits in the Plea Agreement to possession with intent to sell less than 2 grams of cocaine base, Salazar's offence conduct involved 43.45 grams of cocaine base.  See PSR ¶ 17, at 5.  The USPO first asserts that the $2,471.00 "was determined to be proceeds from the sale of cocaine base."  PSR ¶ 17, at 5.  The USPO supports this assertion by way of calculation and by ruling out other sources of the $2,471.00.  See PSR ¶ 17, at 5.  The USPO states that, according to the New Mexico Investigative Support Center, "a gram of cocaine base has an approximate value of $60 to $100 per gram."  PSR ¶ 17, at 5.  How the USPO arrives at 43.45 grams is less clear, because the USPO next asserts: "As a result, Salazar will be held accountable for an additional 42 grams of cocaine base" beyond the 1.448 grams that law enforcement seized in Salazar's home.  PSR ¶ 17, at 5.  See Addendum to the Presentence Report at 1, filed May 7, 2020 (Doc. 32)("PSR Addendum")(providing the same argument as the PSR).  The USPO also avers that, although Salazar contends that he lawfully earned the money through odd jobs and cutting wood, Salazar has not explained adequately how he obtained the $2,471.00.  See PSR Addendum at 2.  The USPO says that "the arresting officer/agent asked to see the defendant's hands which did not appear to look like 'working hands.'  They were clean and callus free."  PSR Addendum at 2 (quoting unknown law enforcement agent).

Salazar disagrees with the USPO's position, and notes, first, that neither the United States nor NM State Police has seized the $2,471.00.  See Objections Addendum at 1.  Salazar also notes that he did not admit, in his "post-Miranda[2] Statement," that he earned the $2,471.00 from selling

---

[2]In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that, because of the coercive nature of custodial interrogations, police must inform criminal suspects of their rights to remain silent and to have an attorney.

drugs.  Objection Addendum at 1.  Salazar maintains that he earned the money by working odd jobs such as woodcutting.  See Objection Addendum at 1-2.

The USPO's assertion lacks "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3.  First, the USPO's own factual premises do not support its conclusion.  The USPO avers that, according to the New Mexico Investigative Support Center, a gram of cocaine base is worth between $60.00 and $100.00.  See PSR ¶ 17, at 5; PSR Addendum at 1.  The USPO then asserts, without explaining its calculation, that this information supports its conclusion that Salazar should "held accountable for an additional 42 grams of cocaine base."  PSR Addendum at 1.  To reach its conclusion, however, it appears that the USPO used a per-gram price of $58.83 ($2,471 divided by forty-two).  The USPO does not explain its decision to base its calculation on a per-gram price below the price range it provides, despite this decision inflating its overall conclusion.  For example, a per-gram price of $100.00 could suggest that Salazar is responsible for 24.71 grams of cocaine base.  The USPO and the United States provide no information about the cocaine-base market in Las Vegas, where Salazar lives and sold the drugs at issue, see PSR ¶¶ 14-17, at 4-5, further reducing the reliability of the USPO's calculation.  Moreover, although the USPO acknowledges that Salazar engaged in legitimate work before his arrest, the USPO's assertion further presumes that all the money in Salazar's possession is attributable only to illicit drug trafficking.  Finally, the USPO does not provide whether its $60.00-$100.00 price range is for wholesale cocaine base or rather is reflective of its resale street value.  See PSR ¶ 17, at 5.  The USPO's cited facts thus do not support its calculation and are insufficiently detailed for the Court to reliably make its own calculation.

Second, the USPO relies upon out-of-court statements whose reliability is not assessable.  The New Mexico Investigative Support Center is a "a multi-agency counter drug intelligence

center supported and funded by the Southwest Border [High-Intensity Drug Trafficking Area] New Mexico Region." Southwest Border High-Intensity Drug Trafficking Area, "Intelligence," https://www.nmhidta.org/default.aspx/MenuItemID/142/MenuGroup/Public+Website+Home.htm?AspxAutoDetectCookieSupport=1 (last visited June 16, 2020)("NMISC). Sonya Marshall, United States Marshal for the District of New Mexico, is the Southwest Border High-Intensity Drug Trafficking Area's Chair. NMISC, "Leadership," https://www.nmhidta.org/default.aspx/MenuItemID/132/MenuGroup/Public+Website+Home.htm (last visited June 16, 2020). The New Mexico Investigative Support Center "promote[s] and facilitate[s] the sharing and coordination of criminal intelligence throughout the Southwest Border and the nation," and "provides criminal drug intelligence services that include investigative case support, event and target de-confliction and the development of strategic intelligence products in support of law enforcement at all levels of government." NMISC. Although the Court has no independent reason to doubt the New Mexico Investigative Support Center, the USPO does not cite its assertion's source or report. See PSR ¶ 17, at 5; PSR Addendum at 2. Similarly, the USPO uses a state-wide price range rather than providing information specific to Las Vegas, where Salazar sold the cocaine base. See PSR ¶¶ 14-17, at 4-5. The Court thus has no way to ascertain the validity of the USPO's assertion.

More suspect is the USPO's quotation of the "arresting officer/agent's" conclusion that Salazar does not have "working hands." PSR Addendum at 2. The court may rely on reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Vigil, 476 F. Supp. 2d at 1245. The USPO does not attribute this quotation or otherwise explain its context. See PSR Addendum at 2. The quotation thus lacks indicia of reliability. Further, even if USPO had attributed the quotation, the unknown law enforcement officer's

statement does not necessarily support the USPO's conclusion. The quotation's relevancy requires piling assumptions that legitimate employment necessarily causes callused hands and so, absent callused hands, Salazar could not have lawfully obtained the $2,471.00. The quotation also presumes that an unknown law enforcement officer could determine, from Salazar's hands, the kind of work he engages. Accordingly, the Court does not rely on the unknown law enforcement officer's characterization of Salazar's hands.

Finally, the USPO justifies its conclusion by asserting that Salazar has not otherwise explained where he obtained the $2,471.00. See PSR Addendum at 2. It is the United States' burden, however, to prove facts that support its requested sentence. See United States v. Reyes, 979 F.2d 1406, 1410 (10th Cir. 1992). Although here the United States need prove such facts only by a preponderance of the evidence, see United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008), the United States has not demonstrated that Salazar is responsible for 43.45 grams of cocaine base. Given the shortcomings of the USPO's other arguments, the Court will not use Salazar's silence to attribute to him a drug amount that the USPO calculates from conjecture and which, as is undisputed, the United States did not locate when it executed a search warrant of Salazar's home. Accordingly, the Court sustains the Objections and concludes that Salazar is responsible for 1.448 grams of cocaine base.

Salazar's base offense level for possession with intent to distribute 1.448 grams of cocaine base is thus 12. See U.S.S.G. § 2D1.1(c)(14). The parties do not object to the USPO's determination and calculations of the reductions to which Salazar is entitled. See Objections at 1-3; Response at 3-4. Because Salazar meets the criteria set forth in subdivisions (1)-(5) of U.S.S.G. § 5C1.2(a), Salazar's base offense level is decreased by two levels. See U.S.S.G. § 2D1.1(b)(18); PSR ¶ 23, at 6. Salazar is entitled to a further 2-level decrease for being a minor participant in the

offense.  See U.S.S.G. § 3B1.2(b); PSR ¶ 25, at 6.  Finally, Salazar is entitled to a further 2-level

decrease for clearly accepting responsibility.  See U.S.S.G. § 3E1.1(a); PSR ¶¶ 29-30, at 6.

Accordingly, Salazar's offense level is 6.  With a criminal history category of 0, Salazar's resulting

Guidelines imprisonment range is 0-6 months.  See U.S.S.G. Sentencing Table.

       **IT IS ORDERED** that the Objections to Presentence Report, filed April 8, 2020 (Doc. 30),

is sustained.

 

_____

             UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Damian Rasmussen
Law Offices of Damian Rasmussen
El Paso, Texas

     *Attorney for the Defendant*